UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

DANNY DOGAN,                          )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )       CIVIL NO. 2:09cv207
                                      )
MICHAEL ASTRUE,                       )
Commissioner of Social Security,      )
                                      )
        Defendant.                    )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying plaintiff's application for Disability
Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social
Security Act.  42 U.S.C. §416(I); 42 U.S.C. §423; 42 U.S.C. §§ 1382, 1382c(a)(3).  Section
205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a
certified copy of the transcript of the record including the evidence upon which the findings and
decision complained of are based.  The court shall have the power to enter, upon the pleadings
and transcript of the record, a judgment affirming, modifying, or reversing the decision of the
[Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he
findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be
conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an
"inability to engage in any substantial gainful activity by reason of any medically determinable
as a whole contains substantial evidence to support the [Commissioner's] findings."  <u>Garfield v.
Schweiker</u>, 732 F.2d 605, 607 (7th Cir. 1984) citing <u>Whitney v. Schweiker</u>, 695 F.2d 784, 786

(7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" <u>Rhoderick v. Heckler</u>, 737 F.2d 714, 715 (7th Cir. 1984) quoting

<u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); <u>see</u> <u>Allen v. Weinberger</u>,

552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed,

42 U.S.C. §405(g), unless there has been an error of law." <u>Garfield</u>, supra at 607; see also

<u>Schnoll v. Harris</u>, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law

Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act on December 31, 2002.

2.    The claimant has not engaged in substantial gainful activity since April 1, 1997, the alleged onset date (20 CFR 404.1520(b), 404.1571 <u>et seq</u>., 416.920(b) and 416.971 <u>et seq</u>.).

3.    Since the alleged onset date of disability, the claimant has had the following severe impairments: Morbid obesity and degenerative joint disease of the left knee (20 CFR 404.1520(c) and 416.920(c)).

4.    Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5.    After careful consideration of the entire record, I find that, prior to April 21, 2008, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he is limited to sitting for 1 ½ hours at a time and standing/or walking for 30 minutes at a time. However, he has been able to sit for a total of six hours in an eight-hour workday and stand and/or walk for a total of two hours in an eight-hour workday. He can occasionally lift up to twenty pounds from knee to chest level and can frequently lift ten pounds for the same range. He can carry such weights. He has been able to occasionally use the feet for operation of foot controls. He can occasionally climb stairs or ramps, but

cannot climb ropes, scaffolds or ladders. He can infrequently (i.e. less than 1/3 of a typical workday) engage in activities that involve balancing, stooping, kneeling, crouching and crawling. He should avoid activities that involve unprotected heights, dangerous machinery and loud noises.

6.  There have been no changes in the claimant's residual functional capacity since April 21, 2008.

7.  Since the alleged onset date of disability, the claimant has been unable to perform past relevant work (20 CFR 404.1565 and 416.965).

8.  The claimant was born on October 21, 1958 and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963). He will not technically attain the age of 50 until October 21, 2008. However, for reasons stated below, I will consider him to have been "closely approaching advanced age" (i.e., ages 50 through 54), since April 21, 2008.

9.  Although the claimant graduated from high school, he attended special education classes and testified that he has some difficulty with reading and mathematics. Therefore, I find that the claimant has no more than a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Prior to April 21, 2008, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Beginning on April 21, 2008, the claimant has not been able to transfer any job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Prior to April 21, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there were a significant number of jobs in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. Beginning on April 21, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

13. The claimant was not disabled prior to April 21, 2008, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

14.    The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2002, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(Tr. 13-18).

Based upon these findings, the ALJ determined that Dogan was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

Dogan filed his opening brief on January 1, 2010.  On April 28, 2010, the defendant filed a memorandum in support of the Commissioner's decision, and on May 10, 2010, Dogan filed his reply.  Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be reversed and remanded.

A five step test has been established to determine whether a claimant is disabled.  See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).  From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

On July 20, 2006, Dogan applied for Disability Insurance (DI) and Supplemental Security Income (SSI) disability benefits alleging that he became unable to work on April 1, 1997. His date last insured was December 31, 2002. Dogan's claims were denied initially and on reconsideration. A request for hearing was filed on May 29, 2007. Administrative Law Judge Dennis Kramer held a hearing on August 4, 2008 and issued a partially favorable decision on September 3, 2008. The ALJ found Dogan disabled as of April 21, 2008, but not prior thereto. Dogan filed a Request for Review regarding the unfavorable portion of the decision and the Appeals Council denied this request on May 22, 2009, leaving the ALJ's decision as the final decision of the Commissioner. Dogan now seeks judicial review of defendant's denial of his disability claims.

Dogan testified as follows: He weighed approximately 425 pounds; he had problems with his knees for approximately 10 years and was told by a specialist that he needed a bilateral knee replacement. (AR. at 31, 36, 38.) He could not stand for long periods. (AR. at 27.) He had difficulty bending because of his bad knees and his weight. (AR. at 38.) He could not put on his socks and would have a difficult time getting out of the bathtub. (AR. at 42-43.) He could only walk 10 to 20 feet and used the electric carts in the grocery store. (AR. at 43.) He could only stand about 10 to 15 minutes without pain and would then need to sit down for 30 minutes before being able to stand up again. (AR. at 44.) He could sit for about 2 hours but could not lift 10 pounds for 2.5 hours (about one-third of an 8 hour workday) or be on his feet for 2.5 hours throughout a workday. (AR. at 44.) He had difficulty doing household chores and would have to stop because his legs would hurt and he was tired. (AR. at 42.) His legs would swell after he was on them for a long period of time. (AR. at 49.) His most comfortable position was lying on

his stomach and he would lie down for at least 3 to 4 hours out of an 8 hour day. (AR. at 45.) He climbed stairs as "rarely as possible" and could not kneel, squat or touch his toes. (AR. at 45.) He had lower back and hip pain. (AR. at 50.) When seated, he sat on a 45 degree slant and did not think he would be able to sit properly in a chair for more than 30 minutes. (AR. at 51-52.)

Dogan's nephews helped with some household chores. (AR. at 41.) He dropped objects because of difficulty with his hands. (AR. at 46-47.) His thumbs also "lock up". (AR. at 49.) He had been diagnosed with high blood pressure 3 years prior to the hearing and prescribed Toprol, Lopressor and Hydrochlorothiazide. (AR. at 39.) He had insomnia and daytime sleepiness and has woken up a couple of times because he quit breathing. (AR. at 40.) He was prescribed Zoloft for depression about 3 years ago. (AR. at 41.) He graduated high school in special education. (AR. at 35.) He had difficulty reading a newspaper, writing a letter or filling out applications. (AR. at 35.) His math was "terrible" and he had a lot of difficulty figuring out correct change. (AR. at 36.)

Dr. Newman testified as follows: Dogan's severe impairments included obesity with a BMI of approximately 58. (AR. at 53.) He would not be able to do more than sedentary work given his weight and knee problem. (AR. at 53.) An x-ray of the left knee in May of 2006 showed moderate arthritis. (AR. at 53.) The grip strength was probably a subjective test without an anatomical basis for the limitation. (AR. at 53.) He might have edema at times, but unless it was a lot of edema, it would not preclude sedentary work. (AR. at 54.) He would have trouble lifting things from the floor and bending over. (AR. at 54.) He could lift up to 20 pounds occasionally as long as it was from knee to waist and 10 pounds frequently from the knee to the

waist level. (AR. at 55.) While carrying, he would need it at knee to chest level. (AR. at 55.) He

could sit for 1.5 hours at one time, stand for 30 minutes and walk for 30 minutes. (AR. at 55.)

He could sit a total of 6 hours and stand/walk a total of 2 hours during a workday. (AR. at 55-

56.) He could reach overhead with no limitation in reaching, handling or fingering. (AR. at 56.)

He could use his feet occasionally (one-third of the day both feet), but obesity could impair the

movement of his legs. (AR. at 56.) He could climb stairs occasionally and should never climb

ladders or scaffolds. (AR. at 57.) He could stoop and crawl less than one-third of a day. (AR. at

57.) If his body has to get out of the way or something was going to threaten him suddenly then

he could never be exposed to moving mechanical parts. (AR. at 59.)

The medical expert testified that he was not familiar with SSR 02-1p. The doctor

acknowledged that Dogan suffered from chronic leg cramps, but that he could not tell the

degree of severity of the cramps. (AR. at 65.) The nurse's report was inconsistent with other

medical evidence because there was not enough pathology to indicate the limitations she

provided. (AR. at 78-79.)

The ALJ gave the following hypothetical question to the Vocational Expert, Ms. Grace

Gianforte: a person with a 12th grade special education with math at the 3rd grade level and

difficulty reading and writing; the ability to lift up to 20 pounds occasionally and 10 pounds

frequently; the ability to sit for 1.5 hours at a time and for a total of 6 hours in a workday; the

ability to stand and walk for 30 minutes and the ability to do that for 2 hours out of a workday;

the ability to occasionally operate foot controls; the limitation to never climb ladders or scaffolds,

to occasionally climb ramps or stairs; and for less than one-third of the day stoop, kneel, crouch

and crawl; and the limitations to never work at unprotected heights or work around moving

mechanical parts, to occasionally operate a motor vehicle and be around vibration. (AR. at 71, 360-65.)

In response to this, Ms. Gianforte testified that a person could perform work as a sorter (DOT number 681-687.018) (1,500 jobs), electronic accessory assembler (DOT number 726.687-014) (3,500 jobs) and hand polisher (DOT number 713.687-034) (2,200 jobs). (AR. at 71.)

If a person could only walk 10 to 20 feet, sit for 2 hours on an incline, sit for 30 minutes upright with the need to stand for 15 to 20 minutes after that, lift and carry occasionally 10 pounds with no frequent lifting, the ability to occasionally reach above his head and climb stairs, but never climb ladders, kneel, squat, or bend to touch his toes, this person would not be capable of work. (AR. at 72-73.)

If a person could not bend, had abnormal ranges of motion in the knees, could only stand, sit and walk with limitations, had difficulty with attention because of drowsiness, and could grip only 60% of normal, this person could not meet productivity standards of work. (AR. at 73-74.)

Treating physician Dr. Pruitt's records from 1995 through 1997 reveal diagnoses of GERD, diarrhea, vomiting, right knee pain and a sprained left ankle with swelling. (AR. at 217-20, 229.) Dogan was diagnosed with a sprain of the right collateral ligament as of February 1996. (AR. at 226.) In January 1999, Mr. Dogan complained of continued knee problems but that he had no money to visit a doctor. (AR. at 222.) By 1999, the option of disability was being discussed. (AR. at 223-24.) As of April 2002, Mr. Dogan weighed over 350 pounds. (AR. at 224.)

Nurse Practitioner Bucholz filled out a physical residual functional capacity questionnaire noting that she treated Dogan since December 8, 2005 through 2008 about every 3 months.

(AR. at 351.) She diagnosed degenerative joint disease of the knees, morbid obesity, hypertension and anxiety. Id. Pain was noted in the knees and hip, increased by walking and standing. Id. Bucholz assessed that Dogan's experience of pain or other symptoms was severe enough to interfere with his attention and concentration on a constant (more than 66% of the day) basis. (AR. at 352.) He was incapable of even low stress jobs because of the pain, obesity and anxiety. Id. He could sit for about 1 hour and stand for about 10 minutes at a time. Id. He could sit for a total of about 2 hours in an 8 hour workday and stand/walk for less than 2 hours in an 8 hour workday. (AR. at 353.) He must shift positions at will and take a break 1 to 3 times a day for 15 minutes at a time. Id. He could rarely lift 10 pounds or less than 10 pounds and never lift 20 pounds or more. Id. He could occasionally look down, turn his head right or left and hold his head in a static position. (AR. at 354.) He could rarely look up. Id. He could rarely twist or climb stairs, and never stoop (bend), crouch/squat or climb ladders. Id. He would likely miss more than 4 days per month as a result of his impairments or treatment. Id. The earliest date these symptoms and limitations apply was December 2005. Id.

Dogan was a patient at the St. Clare Health Clinic during 2006 and 2007. He was measured at 5'6" weighing between 330 and 387 pounds and was diagnosed with morbid obesity, severe degenerative joint disease of the knees bilaterally, hypertension, depression and anxiety. (AR. at 258-63, 266.) He had 1+ edema on the right, ambulated with a limp, and had difficulty getting up and down. Id. He had decreased range of motion of the back and hip with pain and tenderness in both knees. The doctor noted crepitus with movement of the left knee along with generalized tenderness and mild effusion. Id. He was prescribed Zoloft, Toprol and Lopressor. (AR. at 267.)

On an initial history report, Dogan complained of right knee pain due to injury in 1995 or 1996, right ankle swelling and pain since 2002 and that he always struggled with his weight. (AR. at 268.) He complained of insomnia, blurry vision, depression, anxiety and difficulty concentrating. Id. An x-ray of May 29, 2006 revealed prominent marginal osteophytes with joint space sclerosis consistent with moderate tricompartmental osteoarthritis. (AR. at 287.)

In March 2007, a psychological consultative exam was performed at the request of the Administration by Dr. Brown. (AR. at 290.) Dr. Brown noted a "marked odor about his person likely related to his obesity". (AR. at 291.) IQ tests revealed a verbal IQ of 86, performance IQ of 80 and a full scale IQ of 82 which fell within the Low Average range. (AR. at 293.) Dr. Brown diagnosed a mood disorder and morbid obesity. Id. With his limited mathematical reasoning, he might have difficulty independently managing his funds. (AR. at 294.)

A physical exam was also performed at the request of the Administration by Dr. Ibekie. (AR. at 326.) Dr. Ibekie noted a history of hypertension, sleep apnea, degenerative joint disease of the knees, obesity, depression and anxiety. Id. He assessed Dogan at 5'5" and 350 pounds and assessed depression. (AR. at 327.) The doctor assessed that Dogan had stiffness or tenderness in both knees after walking only 20 feet. (AR. at 328.) The range of motion in the knees, ankles, cervical spine and lumbar spine were abnormal. Id. The doctor assessed that Dogan was unable to stand for significant periods of time during the exam. Id. Motor strength was 4/5 in all proximal and distal muscles of all 4 extremities. Id. Grip strength was tested at 3/5 and fine finger manipulative abilities such as buttoning of shirt, zipping pants, picking up coins was assessed at 3/5. Id.

Dr. Ibekie diagnosed morbid obesity, hypertension, chronic osteoarthritis of bilateral

knees and low back, sleep apnea, severe depression, gait dysfunction and lower extremity edema from venostasis. (AR. at 329.) Dr. Ibekie found that standing, sitting and walking could be done with limitation. Id. He assessed that lifting and carrying can be done with difficulty. Id. Gross finger abilities as in dialing or turning a door knob could be done with difficulty. Id.

In May 2007, at the request of the Administration, Dr. Sheikh performed a physical consultative examination. (AR. at 343.) Dr. Sheikh noted a history of arthritis in both knees, crepitation after sitting too long and a difficult time getting up. Id. The doctor assessed that the bottoms of Dogan's feet were discolored, there was fungus on the toes, and edema in the lower extremities. (AR. at 343-44.) Dr. Sheikh noted hypertension that was not controlled by medication. (AR. at 343.) He was prescribed Toprol, Hydrochlorothiazide and Zoloft. Id. Dr. Sheikh assessed Dogan at 5'4"½ , weighing 425 pounds. (AR. at 344.) The doctor assessed bilateral leg swelling with numbness. (AR. at 346.) Dogan was unable to heel toe walk or tandem walk. Id. He was unable to stoop or squat. Id. Dr. Sheikh noted normal strength and sensation. Id. Dynamometer testing (grip strength) revealed 45 kilograms of force in both hands. Id. Dr. Sheikh did not have medical records to review, but diagnosed morbid obesity, bilateral leg parasthesias, and multiple joint pain due to arthritis. (AR. at 346-47.)

The non-examining State Agency reviewer filled out a psychiatric review technique form on September 28, 2006 and found insufficient evidence to form an opinion. (AR. at 235.) Another non-examining State Agency reviewer filled out a psychiatric review technique form finding no severe impairment and mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (AR. at 295, 305.) A nonexamining State Agency doctor filled out a physical residual functional capacity assessment

with the diagnoses of morbid obesity, sleep apnea and arthritis and assessed that Dogan could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk about 6 hours and sit for about 6 hours of an 8 hour workday. (AR. at 333-34.) Dogan could never climb ropes, ladders or scaffolds and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl. (AR. at 335.) He could occasionally reach overhead and frequently reach, handle and finger. (AR. at 336.) He could constantly feel. Id.

Dr. Newman, the medical expert at the hearing, filled out a medical source statement opining that Dogan could occasionally lift 11 to 20 pounds and frequently lift up to10 pounds. (AR. at 360.) He could sit for about 1.5 hours at a time and stand and walk for about 30 minutes at a time. (AR. at 361.) He could sit for a total of 6 hours and stand and walk for a total of 2 hours during an 8 hour workday. Id. Dogan could continuously reach, handle, finger, feel and push/pull with both hands. (AR. at 362.) He could occasionally operate foot controls. Id. Dr. Newman opined that Dogan could never climb ladders or scaffolds and could occasionally climb stairs and ramps. (AR. at 363.) He could, for less than one-third of the day, stoop, kneel, crouch and/or crawl. Id. He could never be around unprotected heights or moving mechanical parts. (AR. at 364.) He could occasionally operate a motor vehicle and be exposed to vibration. Id.

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The agency has promulgated regulations that set forth a five-step sequential process for analyzing disability

claims. 20 C.F.R. §§ 404.1520, 416.920. A claimant has the joint burdens of production and persuasion through at least step four, where the individual's residual functional capacity (RFC) is determined. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); 20 C.F.R. §§ 404.1545, 416.945. At step five the Commissioner bears the burden of proving that there are jobs in the national economy that Dogan can perform. Herron v. Shalala, 19 F.3d 329, 333 n.18 (7th Cir. 1994). In the present case, the ALJ found that Dogan retained the ability to perform other work within the national economy.

The agency's final decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that the agency findings "as to any fact, if supported by substantial evidence, shall be conclusive." "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or on the [Commissioner's] designate, the ALJ)." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)(citations omitted). This court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ found that Dogan's impairments (morbid obesity and degenerative joint disease of the left knee) were severe but did not meet a Listing.

In support of reversal, Dogan claims that the ALJ erred in failing to properly analyze Nurse Practitioner Bucholz's opinion, contrary to SSR 06-3p. The ALJ found that Bucholz, a registered nurse, does not qualify as an "acceptable medical source" in accordance with Section 416.913(a) and that only "acceptable medical sources" are qualified to give "medical opinions"

and therefore, there is no showing that Bucholz is qualified to assess the severity of the Dogan's exertional or mental limitations. (AR. at 16.) The ALJ opined that Dr. Newman's assessment is better supported by the clinical findings in the record and by his "superior expertise". Id.

Dogan argues that The ALJ misunderstood SSR 06-3p and the term "not an acceptable medical source". Dogan contends that SSR 06-3p uses the term "not acceptable medical source" as a term of art, and not meaning a source whose opinion is invalid or unqualified. The term "acceptable medical source" encompasses treating physicians, psychiatrists, psychologists, etc. Only the "acceptable medical source" is allowed to provide a diagnosis in order to determine whether there is a medically determinable impairment and is the only opinion which might be entitled to controlling weight under 20 C.F.R. Section 404.1527(d). SSR 06-3p classifies "not acceptable medical sources" as "other sources" into both medical sources and non-medical sources. Dogan argues that a nurse practitioner would qualify as an "other source" which is a medical source. Dogan claims that the ALJ's misunderstanding led the ALJ to improperly analyze Bucholz's report. (AR. at 16, 351-54.) The ALJ was required to analyze Bucholz's opinion and explain why it was or was not supported by medical evidence of record. SSR 06-3p explains that physician assistants, nurses, etc. are classified as a non-"acceptable medical source[s]" (they are "other sources" who are medical sources). SSR 06-3p does not indicate that such opinions should be rejected; but to the contrary, that the opinions from these medical sources "are important and should be evaluated on key issues such as impairments severity and functional effects, along with the other relevant evidence in the file." The ALJ erred in failing to follow the requirements of SSR 06-3p.

> [A]n opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source,"

including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p. . . .

SSR 06-3p.

Dogan claims that Bucholz stated that she treated Dogan from December 8, 2005 through 2008 with visits approximately every 3 months. (AR. at 351.) She noted diagnoses of degenerative joint disease of both knees, morbid obesity, hypertension and anxiety. Id. She noted pain in the knees and hips which increased due to walking and standing. Id. Bucholz opined that Dogan's experience of pain or other symptoms was severe enough to interfere with his attention and concentration on a constant (more than 60% of the day) basis. (AR. at 352.) He was incapable of even low stress jobs because of his pain, obesity and anxiety. Id. Bucholz opined that Dogan could only sit for a total of 2 hours in an 8 hour workday and stand/walk for less than 2 hours in an 8 hour workday. (AR. at 353.) She opined that Dogan could rarely lift 10 pounds or even less than 10 pounds and that he could never lift 20 pounds or more. Id. Bucholz opined that Dogan would have difficulty looking up and down, turning his head left and right and holding his head in a static position. (AR. at 354.) Dogan argues that, based on this report, he would have been found disabled at least as of December 2005 when Bucholz opined he had such impairments and limitations. Id.

Bucholz's opinion was supported by records from St. Clare Health Clinic which diagnosed morbid obesity, severe degenerative joint disease of both knees, hypertension, depression and anxiety. (AR. at 258-63, 266.) Clinic records revealed edema, ambulation with a

limp and difficulty getting up and down. Id. Records revealed a decreased range of motion of the back and hip with pain, tenderness and crepitus in the knees. (AR. at 258-63, 266-67.) Dr. Ibekie's consultative exam was consistent with the St. Clare Health Clinic records and further supported Bucholz's opinion. Dr. Ibekie diagnosed morbid obesity, hypertension, chronic osteoarthritis of both knees and the lower back, sleep apnea, severe depression, gait dysfunction and lower extremity edema from venostasis. (AR. at 329.) Dr. Ibekie assessed stiffness or tenderness in both knees after walking only 20 feet and that Dogan was unable to stand for significant periods of time during the exam. The doctor opined that Dogan's sitting, standing, walking, lifting, carrying along with fine and gross finger movements were limited by 60%. (AR. at 328- 29.) Dr. Sheikh diagnosed morbid obesity, bilateral leg paresthesias and multiple joint pain due to arthritis. (AR. at 346-47.) He assessed that Dogan was unable to heel-toe walk, unable to tandem walk and unable to stoop or squat. (AR. at 346.) All of these limitations lend further support to Bucholz's opinion.

SSR 06-3p requires the ALJ to consider opinions from "other sources" by applying the factors set forth in 20 C.F.R. 404.1527(d) including the length and frequency of treatment, the consistency of the opinion with other evidence, how well the source explains the opinion, etc. The ALJ erred in failing to apply these factors to Bucholz's opinion. For example, Bucholz's opinion was consistent with other medical evidence in the file as noted above and the ALJ erred in failing to explain how the evidence was inconsistent and/or how such evidence overcame that which supported Bucholz's opinion. Based on these factors, Dogan concludes that Bucholz's opinion deserved greater weight and the ALJ at the very least, should have considered the factors before dismissing her opinion. See Moss v. Astrue, 555 F.3d 556, 561 (7 Cir. th 2009) (finding

the ALJ erred by failing to consider the factors of 20 C.F.R. Section 404.1527(d) in choosing

which medical opinions deserved greater weight); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir.

2008).

The Commissioner argues that "other sources" are generally entitled to significantly less

weight than a treating physician, and that SSR 06-3p does not require articulation of the factors.

The Commissioner correctly asserts that in general, treating physician opinions and those of other

examining physicians generally are given more weight. 20 C.F.R. Section 404.1527(d). However,

the purpose of SSR 06-3p is to acknowledge that "With the growth of managed health care in

recent years and the emphasis on containing medical costs, medical sources who are not

'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed

clinical social workers, have increasingly assumed a greater percentage of the treatment and

evaluation functions previously handled primarily by physicians and psychologists." SSR 06-3p

requires the ALJ to consider and properly weigh opinions such as Bucholz's and the ALJ erred in

failing to do so. Further, while SSR 06-3p does not specifically state an articulation standard with

respect to the factors, it does recognize that the "factors of [20 C.F.R. Sec. 404.1527(d)] represent

basic principles that apply to the consideration of all opinions from medical sources who are not

'acceptable medical sources' as well as from 'other sources.'"

The Commissioner asserts that the ALJ found Dr. Newman's assessment better supported

by clinical findings and his superior expertise but, as Dogan notes, the ALJ did not analyze what

records better supported Dr. Newman's findings as required under 20 C.F.R. Section 404.1527(d).

20 C.F.R. Section 404.1527(d) also recognizes that in general, more weight is given to the

opinion of a source who examined the patient over one who did not. Dr. Newman never examined

Dogan. SSR 06-3p further supports the regulation in that it allows for such other source opinions to be given more weight than even treating physician's opinions in appropriate circumstances, and certainly allows for giving greater weight over that of a nonexamining physician.

The Commissioner correctly points out that Bucholz apparently did not treat Dogan as many times as reported on the functional capacity assessment. The assessment states that she began treating Dogan on December 8, 2005 and that she saw him approximately every three months since that date (at least until April 9, 2008). (AR. at 351.) It appears that Bucholz actually treated Dogan on two occasions. On February 21, 2007 she noted he ambulated with a limp, had difficulty getting up and down out of a chair, that the knees were tender to palpation, that he had pain and difficulty completing range of motion and that he had decreased flexion of the back and range of motion of the hips. (AR. at 258.) She diagnosed severe degenerative joint disease of the knees, morbid obesity, hypertension and anxiety. Id. On May 26, 2006 Bucholz made similar assessments. (AR. at 262, 270.)

Even though it was not Bucholz who treated Dogan on every visit, Dogan was seen at the same facility and because of that, Bucholz had access to all of his visits and could give her opinion on his functional capacity. Dogan argues that, at the very least, the ALJ should have analyzed this in determining the appropriate weight to give Bucholz's opinion, and as the ALJ did not rely on the number of times Bucholz saw Dogan, as a basis for rejecting her testimony, the Commissioner's argument on this point is also post hoc rationalization and precluded. Stewart, 561 F.3d at 684; Getch, 539 F.3d at 481-82; Steele, 290 F.3d at 941; Golembiewski, 322 F.3d at 916. This court agrees with Dogan on this point.

Finally, the Commissioner asserts that Dogan cited cases which are factually

distinguishable since they consider a treating physician's opinion. The Commissioner is correct that both Moss and Bauer address a treating physician's opinion; however, Dogan was citing those cases to indicate the importance of evaluating the factors of 20 C.F.R. Section 404.1527(d), as required by SSR 06-3p for evaluating nurse practitioner opinions, which in turn highlights the ALJ's error in failing to analyze such factors with respect to any of the medical source opinions. Further, Dogan cited to Golembiewski for the proposition that when the ALJ mischaracterizes evidence, the decision is compromised. In this case, the ALJ failed to understand SSR 06-3p which led to a misunderstanding in how to weigh Bucholz's opinion and a misinterpretation of Bucholz's opinion as well as the evidence supporting such an opinion which constitutes grounds for remand. Bowman, 511 F.3d at 1274-75, recognized that SSR 06-3p required the ALJ to properly analyze a physician assistant's opinion and similarly, the ALJ in this case was required to properly analyze the nurse practitioner's opinion.

The ALJ's misinterpretation of SSR 06-3p and his resultant failure to properly analyze or consider Bucholz's opinion constitutes grounds for remand. See Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003) (holding that an ALJ's decision was compromised because of the mischaracterization of medical evidence). See Bowman v. Astrue, 511 F.3d 1270 (10th Cir. 2008) (supporting the argument that SSR 06-3p required the ALJ to properly analyze physician assistants' opinions); see also Sloan v. Astrue, 499 F.3d 883, 888-89 (8th Cir. 2007).

Dogan next argues that the ALJ erred in failing to properly analyze his credibility, contrary to SSR 96-7p. The ALJ found that Dogan's medically determinable impairments could reasonably be expected to produce the impairments, but that the statements concerning the intensity, persistence and limiting effects were not credible prior to April 21, 2008, to the extent

they were inconsistent with the residual functional capacity assessment. (AR. at 15.) "... it is not sufficient for the adjudicator to make a single, conclusory statement that ... the allegations are (or are not) credible." Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001). The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. SSR 96-7p. Dogan argues that the ALJ's credibility determination violated SSR 96-7p because, instead of first making a credibility determination and then forming a residual functional capacity finding, the ALJ stated that Dogan was credible to the extent his testimony was consistent with the residual functional capacity assessment and that it was after April 21, 2008. (AR. at 15.) The court in Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 787-88 (7th Cir. 2003) held that this was:

> ... precisely the kind of conclusory determination SSR 96-7p prohibits. Indeed, the apparently post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the Brindisis' reliability as an initial matter in order to come to a decision on the merits.

Dogan testified that he needed to lie down for 3 to 4 hours during the day, that he had insomnia and that he was tired during the day. (AR. at 40, 42, 45.) He testified he could not lift 10 pounds for one-third of the day. (AR. at 44.) He had difficulty with household chores because of his legs and from being tired and his nephews would help out. (AR. at 41-42.) Dogan claims that the ALJ failed to analyze this testimony and failed to explain how this was inconsistent with evidence from Bucholz, records from St. Clare Health Clinic, Dr. Ibekie and Dr. Sheikh's reports which included findings of sleep apnea, severe depression, morbid obesity, chronic osteoarthritis, complaints of insomnia, significant lifting and walking limitations, difficulty getting up and down, uncontrolled hypertension, bilateral leg swelling with numbness and inability to stoop,

squat or heel-toe or tandem walk. (AR. at 258-63, 266-28, 287, 326-29, 343- 47, 351-54.) In

Lopez ex rel. Lopez, 336 F.3d 535, 540 (7th Cir. 2003), the court reversed an ALJ's decision

finding that the ALJ discussed plaintiff's testimony, treatment history, and objective medical

evidence before discrediting plaintiff's testimony, but did not explain the apparent conflict

between that information and his conclusion that plaintiff was not credible. The court held that

the ALJ was required to explain his decision to disregard plaintiff's testimony. Id. Where medical

signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely

ignore the claimant's allegations and must examine the full range of medical evidence as it relates

to the claim. Zurawski, 245 F.3d at 888.

Thus Dogan argues that the ALJ was required, but failed to explain the inconsistencies

between his activities of daily living, his complaints of pain, and the medical evidence. Id. at 887.

The ALJ must consider the following factors when assessing credibility under SSR 96-7p: the

individual's daily activities; location, duration, frequency and intensity of pain; factors that

precipitate and aggravate the symptoms; treatment received; any measures other than treatment

the individual used to relieve pain/symptoms; any other factors concerning the individual's

functional limitations and restrictions due to pain/other symptoms. SSR 96-7; 20 C.F.R.;

404.1529(c). See Villano, 556 F.3d at 562 (holding that the ALJ erred because he failed to

analyze the factors required under SSR 96-7p and that though he briefly described Villano's

testimony about her daily activities, he did not, for example, explain whether Villano's daily

activities were consistent or inconsistent with the pain and limitations she claimed). The Seventh

Circuit has unequivocally held that ALJs must follow the requirements of the SSR 96-7p when

making credibility determinations. Failure to do so requires reversal. Craft v. Astrue, 539 F.3d

668, 680 (7 Cir. 2008); <u>Indoranto v. Barnhart</u>, 374 F.3d 470, 474 (7th Cir. 2004); <u>Golembiewski</u>, 322 F.3d at 915; <u>Brindisi</u>, 315 F.3d at 787; <u>Steele v. Barnhart</u>, 290 F.3d 936, 941-942 (7th Cir. 2002). The 7th Circuit has held that "[T]he only situations in which an error in the factors considered by the trier of fact in making a credibility determination can confidently be thought harmless are when a contrary determination would have to be set aside as incredible. . . ." <u>Allord v. Barnhart</u>, 455 F.3d 818, 821 (7th Cir. 2006) .

Dogan concludes that the ALJ's finding that Mr. Dogan was not credible prior to April 21, 2008 and that his statements were inconsistent with the residual functional capacity assessment was improper under SSR 96-7p. The ALJ failed to explain why Dogan was credible after April 21, 2008 and not prior thereto. Further, that he was credible to the extent his statements were consistent with the functional capacity is backward reasoning as held in <u>Brindisi ex rel. Brindisi v. Barnhart</u>, 315 F.3d 783, 787-88 (7th Cir. 2003) (holding that the ALJ's statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those that did not). The Commissioner failed to address these errors in the ALJ credibility analysis. <u>See</u> <u>Lechner v. Barnhart</u>, 321 F. Supp.2d 1015, 1030 (E.D. Wis. 2004) (finding the Commissioner failed to specifically address plaintiff's credibility argument in her brief, thus waiving her right to do so; the court reversed based on the ALJ's failure to make a proper credibility determination); <u>see also</u> <u>Stemper v. Barnhart</u>, No. 04C838, 2005 WL 857033, Westlaw *5 (W.D. Wis. April 14, 2005) (remanding based on the Commissioner's failure to address one of plaintiff's arguments in her brief and the ALJ's failure to provide a sufficient analysis on that argument); <u>Embry v. Barnhart</u>, No. 02C3821, 2003 WL 21704425, *10 (N.D. Ill. Jul. 18, 2003) (finding that the ALJ failed to explain why he gave greater weight to a non-

examining consultant's report over an examining physician's report and reversing, noting the Commissioner failed to address the argument in her brief).

In response, the Commissioner asserts that the ALJ properly considered Dogan's activities of daily living. However, the ALJ only mentions such activities of daily living with respect to rejecting any manipulative limitations. (AR. at 15.) The ALJ failed to address Dogan's testimony that he needed to lie down during the day, that he could not lift 10 pounds for one-third of the day, and that he had difficulty with household chores because of his legs and from being tired, and that his nephews would often help out. (AR. at 40-42, 44-45.) The ALJ failed to analyze how Dogan's testimony was inconsistent with the medical records contrary to SSR 96-7p. See Lopez ex rel. Lopez, 336 F.3d 535, 540 (7th Cir. 2003) (finding that the ALJ discussed plaintiff's testimony, treatment history, and objective medical evidence before discrediting plaintiff's testimony, but did not explain the apparent conflict between that information and his conclusion that plaintiff was not credible). Moreover, records from Bucholz, St. Clare Health Clinic, Dr. Ibekie and Dr. Sheikh support Dogan's testimony and the ALJ erred in failing explain how such records did not support his testimony or were inconsistent with the testimony. Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001).

The Commissioner further asserts that the ALJ "clearly factored" pain into the residual functional capacity assessment by limiting Dogan to sedentary work. First, this is post hoc rationalization as the ALJ did not discuss how he factored Dogan's pain into his functional capacity, nor did he explain how Plaintiff's testimony regarding his pain was inconsistent with the medical records. Stewart, 561 F.3d at 684; Getch, 539 F.3d at 481-82; Steele, 290 F.3d at 941; Golembiewski, 322 F.3d at 916. Second, the Commissioner fails to explain how limiting a person

to sedentary work takes into account Dogan's pain. Perhaps if Dogan could lie down during the day or could take breaks throughout the day, that would factor Dogan's pain into account. Perhaps if the ALJ included limitations regarding Dogan's inability to concentrate due to his pain, that would have sufficed in addressing the pain. But the ALJ failed to do any of the above and failed to explain how a limitation to sedentary work considered Dogan's pain. The ALJ was required to explain the inconsistencies between Dogan's activities of daily living, his complaints of pain and the medical evidence and the ALJ erred in failing to do so. Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009) (holding that the ALJ erred because he failed to analyze the factors required under SSR 96-7p and that though he briefly described Villano's testimony about her daily activities, he did not, for example, explain whether Villano's daily activities were consistent or inconsistent with the pain and limitations she claimed); Craft v. Astrue, 539 F.3d 668, 680 (7th Cir. 2008); Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004); Golembiewski, 322 F.3d at 915; Brindisi, 315 F.3d at 787; Steele, 290 F.3d at 941-942. The ALJ's credibility analysis wholly failed to follow the analysis required by Zurawski, which required the ALJ to explain his decision to disregard Dogan's testimony of pain, especially when medical signs and findings reasonably support complaints of pain. Zurawski, 245 F.3d at 888.

Next, Dogan argues that the ALJ erred by failing to properly analyze his obesity under SSR 02-1p and in combination with his other impairments under the Listings of Impairments. Dogan claims that the ALJ ignored SSR 02-1p which gives specific instructions on how an ALJ must analyze obesity. Dogan was approximately 5'6", weighing between 330 and 425 pounds with BMIs ranging from 53.3 to 68.65, thus constituting morbid obesity. (AR. at 224, 258, 265, 267, 326, 344.) Under SSR 02-1p, a BMI of 40 or greater constitutes extreme obesity and Dogan

was well over a BMI of 40 at least since April 2002. While the ALJ considered morbid obesity a severe impairment, Dogan contends the ALJ erred in failing to properly analyze the morbid obesity in combination with his other impairments contrary to SSR 02-1p. SSR 02-1p recognizes that "Obesity is a medically determinable impairment and adjudicators must take its effects into consideration when evaluating disability. The combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." For example, some people with obesity may also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea. SSR 02-1p. Dogan complained of fatigue, testifying that he had to lie down 3-4 hours a day, that he had insomnia and daytime sleepiness. (AR. at 40, 45.) See Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009) (finding that the ALJ was required to analyze plaintiff's fatigue); see also Martinez v. Astrue, No. 09-cv-62, 2009 WL 4611415, *12 (N.D. Ind. Nov. 30, 2009) (holding that the ALJ's failure to address plaintiff's need to lie down during the day constituted reversible error). Dogan argues that the ALJ failed to even mention this aspect of his testimony and failed to explain how this fatigue was not consistent with Dogan's obesity and sleep apnea, contrary to SSR 02-1p. See Villano, 556 F.3d at 562 (finding the ALJ must specifically address the effects of obesity on a claimant's limitations under SSR 02-1p); see also Golembiewski, 322 F.3d at 918 (holding that the ALJ was required to consider the "entire constellation of ailments" affecting plaintiff); see also Clifford v. Apfel, 227 F.3d 863, 873 (7th Cir. 2000) (ruling that while the plaintiff may not meet the listing requirements for obesity, the ALJ cannot "blind" himself to the condition and "should have considered the weight issue with

the aggregate effect of her other impairments.").

SSR 02-1p also recognizes that obesity often exacerbates conditions such as arthritis. Dogan was diagnosed with degenerative joint disease in both knees which was at times noted to be severe. (AR. at 258-49, 328, 346-47, 351.) Bucholz relied on Dogan's morbid obesity and degenerative joint disease of the knees opining that Mr. Dogan's pain or other symptoms was severe enough to interfere with his attention and concentration more than 66% of the day. (AR. at 351-52.) She opined that he could stand/walk for a total of less than 2 hours during a workday and that he could rarely lift even 10 pounds. (AR. at 352-53.) Dr. Ibekie diagnosed morbid obesity, chronic osteoarthritis of the knees bilaterally with gait dysfunction. (AR. at 329.) Dr. Ibekie found a 60% limitation in Dogan's ability to sit, stand and walk which was fairly consistent and certainly not inconsistent with Ms. Bucholz's report. (AR. at 329.) Dr. Sheikh diagnosed morbid obesity, multiple joint pain due to arthritis and bilateral leg paresthesias and also noted difficulty walking, stooping and squatting. (AR. at 346-47.) Dogan points out that this was certainly not inconsistent with either of the above opinions. Moreover, these reports were consistent with Dogan's testimony regarding difficulty standing, walking and lifting because of his knees. (AR. at 27, 36, 38, 41-45.) Dogan asserts that the ALJ erred in failing to consider his morbid obesity in combination with his bilateral knee arthritis contrary to SSR 02-1p.

In Barrett v. Barnhart, 355 F.3d 1065, 1068-69 (7th Cir. 2004), the court found that Barrett's arthritis was exacerbated by her obesity. The fact that her arthritis was exacerbated by her obesity did not make the arthritis a less serious condition, but on the contrary a more serious one. Id. at 1068. "Even if Barrett's arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a

person who was either as obese as she or as arthritic as she but not both." Id. at 1068-69. See Villano, 556 F.3d at 562 (holding that under SSR 02-1p the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic); see Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005) (holding that the ALJ erred in failing to consider plaintiff's impairments in combination, as the cases require citing to Barrett and others. "Sometimes, as in the present case, obesity or some other health condition merely aggravates a disability caused by something else; it still must be considered for its incremental effect on the disability, as the administrative law judge failed to do").

Dogan contends that the ALJ further erred by failing to consider the effects of obesity on whether Dogan's impairments met or equaled a listed impairment as required by 20 C.F.R. Pt. 404, Subpt. P, App.1 Listing 1.00(Q):

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments. . . adjudicators must consider any additional and cumulative effects of obesity.

Dogan further contends that the ALJ should have considered whether Dogan's morbid obesity in combination with his osteoarthritis could have met or equaled Listing 1.02. The listing requires major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and medically acceptable imaging of joint space narrowing. . . with involvement of one major peripheral weight-bearing joint (i.e., hip, knee or ankle), resulting in an inability to

ambulate effectively6. 20 C.F.R. Pt. 404, Subpt. P, App. 1 Listing 1.02A. Dogan had major dysfunction of both knees with chronic joint pain. (AR. at 258-62, 351.) He had stiffness, numbness and limited range of motion. (AR. at 328, 346.) He ambulated with a limp or had difficulty ambulating and had difficulty getting up, down and standing. (AR. at 258-59, 262, 328-29.) An x-ray revealed prominent marginal osteophytes with joint space sclerosis consistent with moderate tricompartmental osteoarthritis. (AR. at 287.) Thus, Dogan concludes that even ignoring the morbid obesity, Dogan could arguably have met Listing 1.02.

If morbid obesity is taken in combination with 's bilateral knee impairments, this gives even greater support for finding Dogan met or equaled Listing 1.02. Thus, claims Dogan, the ALJ at the very least, was required to discuss or at least mention this listing given the combination of impairments and he erred in failing to do so. "ALJs must sufficiently articulate their assessment of the evidence to assure us that they considered the important evidence and . . . to enable us to trace the path of their reasoning." See Brindisi, 315 F.3d at 786 (7th Cir. 2003) (holding that "failure to reference the listing left the court with 'grave reservations' as to whether the ALJ adequately assessed the criteria of the listing"; further finding that "the omission of any discussion of plaintiff's impairments with the listings 'frustrates any attempt at judicial review.'"). See also Scott v. Barnhart, 297 F.3d 589 (7th Cir. 2002) (remanding when the ALJ failed to minimally articulate the basis for finding plaintiff did not meet the listing); Golembiewski, 322 F.3d at 918 (holding that the ALJ was required to consider the "entire constellation of ailments" affecting plaintiff); Clifford, 227 F.3d at 873 (ruling that while the plaintiff may not meet the listing requirements for obesity, the ALJ cannot "blind" himself to the condition and "should have considered the weight issue with the aggregate effect of her other

impairments.").

The Commissioner, however, asserts that the ALJ properly considered Dogan's obesity because the ALJ summarized medical records which revealed obesity and because two non-examining medical experts gave opinions indicating Dogan could perform sedentary work. The Commissioner is correct in his assertion; however, the ALJ failed to analyze Dogan's obesity under SSR 02-1p, and erred in failing to analyze the extreme morbid obesity in combination with the severe degenerative joint disease of the knees which was likely further exacerbated because of the morbid obesity. SSR 02-1p. The ALJ failed to analyze the findings of Bucholz, Dr. Ibekie and Dr. Sheikh which all supported finding greater limitations based on Dogan's inability to stand, walk and sit due to his morbid obesity and arthritis. Bucholz opined that Dogan could stand/walk for a total of less than two hours a day; Dr. Ibekie opined that Dogan could not sit for a total of six hours a day (as noted by his 60% limitation in sitting). (AR. at 252-53, 329.) The ALJ failed to explain how he considered these opinions given that they focused on the morbid obesity and arthritis, and why, under SSR 02-1p, the ALJ did not find greater limitations in his functional capacity assessment given these opinions. See Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005) (holding that the ALJ erred in failing to consider plaintiff's impairments in combination, as the cases require citing to Barrett and others and finding that even if obesity merely aggravates a disability caused by something else, it still must be considered for its incremental effect on the disability which the ALJ failed to do); Barrett v. Barnhart, 355 F.3d 1065, 1068-69 (7th Cir. 2004).

The Commissioner also asserts that Dogan did not undergo a sleep study for sleep apnea and did not complain about fatigue. While it is true that Dogan did not undergo a sleep study, Dr.

Ibekie did diagnose sleep apnea (AR. at 329) and SSR 02-1p recognizes that it is often a common occurrence due to obesity. Further, the Commissioner is wrong in stating Dogan did not complain about fatigue. Dogan complained about fatigue and it was noted in records at St. Clare and in Dr. Sheikh's report. (AR. at 269, 343.) Records also reveal complaints of insomnia. (AR. at 268, 290.) Such records support Dogan's testimony that he was fatigued and that he needed to lie down during the day. The ALJ erred in failing to discuss Dogan's fatigue. See Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009) (finding that the ALJ was required to analyze plaintiff's fatigue); see also Martinez v. Astrue, No. 09-cv-62, 2009 WL 4611415, *12 (N.D. Ind. Nov. 30, 2009) (holding that the ALJ's failure to address plaintiff's need to lie down during the day constituted reversible error). "In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." SSR 02-1p; Gentle, 430 F.3d at 868. Contrary to the Commissioner's assertion, Dogan did address the full range of requirements of Listing 1.02A and also demonstrated ineffective ambulation, as he was noted to walk with a limp and/or had difficulty ambulating; he had difficulty getting up, down and standing; he had stiffness or tenderness after walking only 20 feet; he was assessed with gait dysfunction; he was unable to heel-toe walk and unable to tandem walk; and his knees were unable to stand for a significant period of time. (AR. at 258, 262, 328-29, 346-47.) 20 C.F.R. Pt. 404, Subpt. P, App.1 Listing 1.00B(b)(1-2) indicates that to ambulate effectively, an individual must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. Examples include the inability to walk a block at a reasonable pace on rough or uneven surfaces or the inability to climb a few steps at a reasonable pace with the use of a single hand rail. Dogan's significant

difficulty in ambulation is supported by his diagnosis of severe degenerative joint disease and his extreme morbid obesity. (AR. at 258-59, 329, 351.) It is supported by Bucholz's treatment notes which revealed that he walked with a limp, had difficulty getting up and down from a chair, that he could only stand for about ten minutes at a time, that he had stiffness or tenderness in both knees after walking only twenty feet, that he had gait dysfunction and that he was unable to stand for any significant period of time. (AR. at 258.) Clearly, the ALJ erred in failing to explain how this evidence did not support Dogan meeting Listing 1.02A. At the very least, the ALJ should have analyzed Listing 1.02A. This failure is reversible error. Brindisi, 315 F.3d at 786 (holding that "failure to reference the listing left the court with 'grave reservations' as to whether the ALJ adequately assessed the criteria of the listing"; further finding that "the omission of any discussion of plaintiff's impairments with the listings 'frustrates any attempt at judicial review.'"); Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006). See also Scott v. Barnhart, 297 F.3d 589 (7th Cir. 2002); Golembiewski, 322 F.3d at 918; Clifford, 227 F.3d at 873. Further, since the ALJ failed to analyze Listing 1.02A at all, any attempt at explanation by the Commissioner constitutes post hoc error which is precluded. Stewart, 561 F.3d at 684; Getch, 539 F.3d at 481-82; Steele, 290 F.3d at 941; Golembiewski, 322 F.3d at 916.

The ALJ also failed to analyze Dogan's obesity in combination with his severe degenerative joint disease of the knees in order to determine whether it equaled Listing 1.02A. The Commissioner asserts that the ALJ considered Dogan's obesity in his residual functional capacity finding; however, that the ALJ considered an impairment at Step 4, does not suffice for an analysis at Step 3, especially when the evidence suggested that Dogan met the listing. ALJs must "consider the effects of obesity not only under the listings but also when assessing a claim

at other steps of the sequential evaluation process." SSR 02-1p. The ALJ must address whether obesity on its own or in combination meets or equals a listing. SSR 02-1p. In the present case, the ALJ erred in failing to analyze Dogan's obesity on its own or in combination to determine whether it met or equaled a listing.

The Commissioner asserts that the ALJ relied on the State Agency opinion in considering obesity. However, this is erroneous as the ALJ never mentioned a State Agency opinion, and as such, it is post hoc rationalization and precluded. Parker v. Astrue 597 F.3d 920, 922 (7th Cir. 2010) (finding that the Commissioner could not rely on reports by two nonexamining physicians that the administrative law judge did not see fit even to mention); Stewart, 561 F.3d at 684; Getch, 539 F.3d at 481-82; Steele, 290 F.3d at 941; Golembiewski, 322 F.3d at 916. Thus, remand is appropriate for this reason also.

Finally, Dogan argues that the ALJ erred in failing to properly analyze his limitation in his ability to stoop. Under SSR 96-9p, "An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply. . . ." Bucholz opined that Dogan could never stoop (bend) or crouch/squat. (AR. at 354.) Dr. Sheikh opined that Dogan was unable to stoop or squat. (AR. at 346.) These were the only examining source's opinions regarding Dogan's ability /inability to stoop or squat and had the ALJ adopted that finding, SSR 96-9p suggests that the ALJ should have found Dogan disabled. Instead, the ALJ adopted the nonexamining medical expert's opinion that Dogan could stoop for less than one-third of a day (but not never) and failed to explain why he adopted that opinion over two examining sources' opinions. See Gudgel v.

Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) (ruling that the contrary opinion of a nonexamining physician, by itself, does not constitute substantial evidence to upset a treating or examining physician's opinion); 20 C.F.R. Section 404.1527(d)(1). The ALJ's decision must be based on all relevant evidence and he must articulate at some minimal level his analysis of the evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ may not select and discuss only the evidence that favors his ultimate conclusion. Id. In Young v. Barnhart, 362 F.3d 995, 1002 (7th Cir. 2004), the court held that the ALJ erred when he failed to account for evidence in the record regarding some of plaintiff's limitations. See Green v. Shalala, 51 F.3d 96, 102 (7th Cir.1995) (remanding because ALJ failed to grapple with significant evidence of record).

The Commissioner correctly notes that a limitation to never stooping does not direct a finding of disability. However, SSR 96-9p does state that the ability to stoop on an occasional basis, "is required in most unskilled sedentary occupations" and that "a complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply. . . ." Given that the only two examining source opinions assessed that  Dogan could never stoop (AR. at 346, 354), the ALJ was at the very least, required to analyze this evidence especially given its significance under SSR 96-9p, in that such a limitation would "usually" lead to a finding of disability. See Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994); Young v. Barnhart, 362 F.3d 995, 1002 (7th Cir. 2004); Green v. Shalala, 51 F.3d 96, 102 (7th Cir.1995); Lauer v. Apfel, 169 F.3d 489 (7th Cir. 1999) (requiring the ALJ to consider SSR 96-9p in analyzing whether a claimant's inability to stoop directed a finding of disability).

The Commissioner claims that Dr. Sheikh's opinion that Dogan could not stoop was

only based on one observation; however, even if Dogan's inability to stoop waxed and waned, he still at times was unable to stoop and the ALJ made a finding that he could stoop up to 20 minutes per hour, 5 days a week. Given that both Bucholz and Dr. Sheikh found Dogan could never stoop, the ALJ erred in failing to analyze such a limitation and erred in failing to explain why he adopted the non-examining medical expert's opinion over the opinions of the examining sources opinions. See Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000) (finding that more weight is generally given to the opinion of the treating physician); Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, remand is also warranted on this basis.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REVERSED AND REMANDED.


 Entered: June 3, 2010.


                                                            s/ William C.  Lee
                                                            William C. Lee, Judge
                                                            United States District Court